# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff,** | ) | **VERIFIED COMPLAINT** |
| | ) | |
| - v.- | ) | |
| | ) | |
| **REAL PROPERTY LOCATED IN LOS** | ) | Civil No. 4:20-cv-02524 |
| **ANGELES, CALIF., COMMONLY** | ) | |
| **KNOWN AS 755 SARBONNE ROAD, LOS** | ) | |
| **ANGELES, CALIF. 90077, AND ALL** | ) | |
| **APPURTENANCES, IMPROVEMENTS,** | ) | |
| **AND ATTACHMENTS LOCATED** | ) | |
| **THEREON, AND ANY PROPERTY** | ) | |
| **TRACEABLE THERETO,** | ) | |
| | ) | |
| **Defendant In Rem** | ) | |
| | ) | |
| | ) | |

_____

Comes now the Plaintiff, the United States of America, through its undersigned attorneys, and alleges, upon information and belief, as follows:

## I.

## NATURE OF THE ACTION

1.      This is an action *in rem* to forfeit a parcel of luxury real estate derived from an international conspiracy to obtain lucrative business opportunities in the Nigerian oil and gas sector in return for corruptly offering and giving millions of dollars' worth of gifts and benefits to the former Nigerian Minister for Petroleum Resources, Diezani Alison-Madueke ("ALISON-

MADUEKE"); and to subsequently launder the proceeds of the illicit business opportunities into and through the United States.

2.      From in or about April 2010 until in or about May 2015, ALISON-MADUEKE—who was often referred to as "the Madam" or "Madam D"—was Nigeria's Minister for Petroleum Resources.  In that role, she was responsible for overseeing Nigeria's state-owned oil company, the Nigerian National Petroleum Corporation ("NNPC").

3.      As alleged herein, Kolawole Akanni Aluko ("ALUKO"), Olajide Omokore ("OMOKORE"), and others: (i) conspired to and did purchase millions of dollars in real estate in and around London, U.K., for the use and benefit of ALISON-MADUEKE and her family; (ii) conspired to and did provide more than one million dollars in furniture, artwork, and other furnishings purchased within the Southern District of Texas, and shipped, in part, to London and Abuja, Nigeria, for the use and benefit of ALISON-MADUEKE and her family; and (iii) conspired to and did otherwise fund a lavish and privileged lifestyle for ALISON-MADUEKE and her family.

4.      As further alleged herein, ALISON-MADUEKE, in return for such improper inducements, used her influence as the Minister for Petroleum Resources to steer to companies beneficially owned by ALUKO and OMOKORE the award of multiple Strategic Alliance Agreements ("SAAs") with an NNPC subsidiary.

5.      As further alleged herein, the companies that received these SAAs were unqualified and either improperly performed their obligations or, in some instances, failed entirely to perform. Nevertheless, these companies received more than $1.5 billion in revenues through the sale of Nigerian crude oil.

6.     As further alleged herein, ALUKO and OMOKORE laundered their illicit revenues into and through the United States.  In particular, ALUKO used some of these revenues to acquire the Defendant In Rem.  Moreover, ALUKO used a series of shell companies and layered financial transactions to conceal the nature, location, source, and/or ownership of the proceeds of the unlawful conduct and of the Defendant In Rem purchased with such proceeds.

7.     As property constituting, derived from, or traceable to the proceeds of "specified unlawful activity," as that term is defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit "specified unlawful activity," and as property involved in money laundering violations of 18 U.S.C. §§ 1956 and 1957, the Defendant In Rem is subject to forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).

## II.

## THE DEFENDANT IN REM

8.     This is an action by the United States of America seeking forfeiture of all right, title, and interest in real property located in Los Angeles, Calif., commonly known as 755 Sarbonne Road, Los Angeles, Calif. 90077, as more fully described in Exhibit A, and all appurtenances, improvements, and attachments located thereon, and any property traceable thereto (the "Defendant In Rem").

## III.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355(a).

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to forfeiture took place in the Southern District of Texas.

11.     This action *in rem* for forfeiture is governed by 18 U.S.C. §§ 981 and 983, the Federal Rules of Civil Procedure, and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

## IV.

## **<u>STATUTORY BASIS FOR FORFEITURE</u>**

12.     The Defendant In Rem is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of an offense constituting a "specified unlawful activity" or a conspiracy to commit such an offense.  "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include an offense against a foreign nation involving "bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official," *see* 18 U.S.C. § 1956(c)(7)(B)(iv); any felony violation of the Foreign Corrupt Practices Act ("FCPA"), *see* 18 U.S.C. § 1956(c)(7)(D); or any violations of 18 U.S.C. §§ 1343 (wire fraud), 2314 (interstate transportation of stolen property), and 2315 (interstate receipt of stolen property), *see* 18 U.S.C. §§ 1956(c)(7)(A) & 1961(1).

13.     The Defendant In Rem is also subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or is traceable to such property.  Section 1957 prohibits the conducting of a monetary transaction with property valued at over $10,000 that is known to be criminally derived and which constitutes the proceeds of "specified unlawful activity," including the proceeds of an offense against a foreign nation involving "bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official," *see* 18 U.S.C. § 1956(c)(7)(B)(iv); of any felony violation of the FCPA, *see* 18 U.S.C. § 1956(c)(7)(D); or of any

violations of 18 U.S.C. §§ 1343 (wire fraud), 2314 (interstate transportation of stolen property), and 2315 (interstate receipt of stolen property), *see* 18 U.S.C. §§ 1956(c)(7)(A) & 1961(1).

14.     The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(B), or is traceable to such property.  Section 1956(a)(1)(B) prohibits the conducting of a financial transaction with property known to be the proceeds of unlawful activity with the intent to conceal the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity, including the proceeds of an offense against a foreign nation involving "bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official," *see* 18 U.S.C. § 1956(c)(7)(B)(iv); of any felony violation of the FCPA, *see* 18 U.S.C. § 1956(c)(7)(D); or of any violations of 18 U.S.C. §§ 1343 (wire fraud), 2314 (interstate transportation of stolen property), and 2315 (interstate receipt of stolen property), *see* 18 U.S.C. §§ 1956(c)(7)(A) & 1961(1).

15.     The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(2), or is traceable to such property.  Section 1956(a)(2) prohibits transferring funds known to be the proceeds of unlawful activity from a place outside the United States to a place in the United States, with knowledge that the transfer is designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity, including the proceeds of an offense against a foreign nation involving "bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official," *see* 18 U.S.C. § 1956(c)(7)(B)(iv); of any felony violation of the FCPA, *see* 18 U.S.C. § 1956(c)(7)(D); or of any violations of 18 U.S.C. §§ 1343 (wire fraud),

2314 (interstate transportation of stolen property), and 2315 (interstate receipt of stolen property), *see* 18 U.S.C. §§ 1956(c)(7)(A) & 1961(1).

16.    The Defendant In Rem is further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because its constitutes property involved in a conspiracy to violate 18 U.S.C. §§ 1956 or 1957, in violation of 18 U.S.C. § 1956(h).

17.    A representative selection of relevant offenses against a foreign nation as referred to in the foregoing paragraphs is set forth in Exhibit B.

## V.

## RELEVANT PERSONS AND ENTITIES

18.    On information and belief, the United States alleges the following facts.

19.    **Diezani ALISON-MADUEKE** is the former Nigerian Minister for Petroleum Resources who served in that position from in or about April 2010 through in or about May 2015. In that role, ALISON-MADUEKE was responsible for overseeing NNPC.  In her capacity as Minister for Petroleum Resources, ALISON-MADUEKE was a "foreign official" as that term is defined in the FCPA, *see* 15 U.S.C. §§ 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

20.    The **Nigerian National Petroleum Corporation** is Nigeria's state-owned oil corporation through which the Federal Government of Nigeria regulates and participates in the country's petroleum and hydrocarbons industry.  The NNPC was owned and controlled by the Nigerian government and performed government functions, and thus was an "instrumentality" within the meaning of the FCPA, *see* 15 U.S.C. §§ 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

21.    The **Nigerian Petroleum Development Company** ("**NPDC**") is the wholly-owned operating subsidiary of NNPC.  The NPDC was owned and controlled by the Nigerian government

and performed government functions, and thus was an "instrumentality" within the meaning of the FCPA, *see* 15 U.S.C. §§ 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

22.     **Kolawole Akanni ALUKO** is a Nigerian citizen whose record address is in Porza-Lugano, Switzerland.  ALUKO and OMOKORE (see below) are the beneficial owners of and have or had control over ATLANTIC ENERGY HOLDINGS LTD. along with that company's subsidiaries and affiliates—including ATLANTIC ENERGY DRILLING CONCEPTS NIGERIA LTD. and ATLANTIC ENERGY BRASS DEVELOPMENT LTD.  ALUKO was also, at all times relevant to this complaint, a director and beneficial owner of TENKA LTD. and is the 100% owner of EARNSHAW ASSOCIATES LTD.

23.     **Olajide OMOKORE** is a Nigerian citizen living in Lagos, Nigeria, and is a business partner of ALUKO.  With ALUKO, OMOKORE is a beneficial owner of and has or had control over ATLANTIC ENERGY HOLDINGS LTD. along with that company's subsidiaries and affiliates—including ATLANTIC ENERGY DRILLING CONCEPTS NIGERIA LTD. and ATLANTIC ENERGY BRASS DEVELOPMENT LTD.

24.     **ATLANTIC ENERGY HOLDINGS LTD.** ("AEH") is a company incorporated in the British Virgin Islands with registered address of 325 Waterfront Drive, Omar Hodge Building, Wickham's Cay, Road Town, Tortola, B.V.I.  AEH is beneficially owned, directly or indirectly, by ALUKO and OMOKORE.

25.     **ATLANTIC ENERGY (BRASS) LTD.** is a company incorporated in the British Virgin Islands with the same registered address as AEH:  325 Waterfront Drive, Omar Hodge Building, Wickham's Cay, Road Town, Tortola, B.V.I.  Upon information and belief, ATLANTIC ENERGY (BRASS) LTD. is beneficially owned, directly or indirectly, by ALUKO and OMOKORE.

26. **ATLANTIC ENERGY DRILLING CONCEPTS NIGERIA LTD.** ("**AEDC**") is a company incorporated in Nigeria with registered address of Plot 1267 Ahmadu Bello Way, Garki, Abuja, Nigeria. OMOKORE is a registered director of AEDC. AEH owns 49,999,999 of 50,000,000 shares of AEDC.

27. **ATLANTIC ENERGY BRASS DEVELOPMENT LTD.** ("**AEBD**") is a company incorporated in Nigeria with registered address of 32A Ademola Adetokunbo Street, Victoria Island, Lagos, Nigeria. OMOKORE is a registered director of AEBD. ATLANTIC ENERGY (BRASS) LTD. owns 9,999,999 of 10,000,000 shares of AEBD.

28. **TENKA LTD.** ("**TENKA**") is a company incorporated in the United Kingdom with registered address of No. 1 London Bridge, London SE1 9BG, U.K. During all times relevant to this complaint, the directors of TENKA were ALUKO and his wife. Upon information and belief, TENKA is beneficially owned by ALUKO.

29. **EARNSHAW ASSOCIATES LTD.** ("**EARNSHAW**") is a company incorporated in the British Virgin Islands with registered address of 24 De Castro Street, Akara Building, Wickham's Cay 1, Road Town, Tortola, B.V.I. ALUKO owns 100% of EARNSHAW.

30. **CO-CONSPIRATOR #1** is a dual citizen of the United States and Nigeria whose principal residence is in Topanga, Calif.

31. **CO-CONSPIRATOR #2** is a Nigerian citizen and a former resident of the United States who maintained a residence in Potomac, Md.

32. **CO-CONSPIRATOR #3** is a dual citizen of the United States and Nigeria and a former resident of the United States who maintained a residence in Oakland, Calif.

## VI.

## FACTS

**A.      Strategic Alliance Agreements and Oil Mining Leases**

33.      Prior to 2010, NNPC participated in a joint venture with the subsidiary of a major international oil company (the "IOC Subsidiary") for the development and production of oil and gas in connection with eight oil mining leases ("OMLs").  In particular, the joint venture held interests in and operated OMLs 26, 30, 34, and 42 (the "Forcados OMLs") and OMLs 60, 61, 62, and 63 (the "Brass OMLs").

34.      The IOC Subsidiary owned 45% of the joint venture, with the remainder owned by NNPC.  In 2010, however, the IOC Subsidiary chose to divest itself and sold its minority stake to various indigenous Nigerian entities.

35.      With the IOC Subsidiary's departure, NNPC became responsible for financing and operating the OMLs.  It assigned this task—along with its 55% majority stake—to its own operating subsidiary, NPDC.  However, NPDC lacked the in-house technical expertise and the financial resources to fund and operate the OMLs.  NPDC therefore sought to enter into Strategic Alliance Agreements to partner with outside parties who could both finance and provide technical assistance for the operation of the OMLs on NPDC's behalf.

**B.      ALISON-MADUEKE Was Instrumental in the Award of the Lucrative Forcados SAAs (OMLs 26, 30, 34, and 42) to AEDC**

36.      AEDC was incorporated in Nigeria on or about July 19, 2010, approximately three months after ALISON-MADUEKE was appointed Minister for Petroleum Resources.

37.      On or about March 8, 2011, AEDC first expressed its interest in entering into an SAA in a letter to NPDC.  Less than three weeks later, on or about March 28, 2011, ALUKO,

acting on behalf of AEDC, attended a meeting with NPDC representatives to discuss a possible SAA award.

38.     Within another three weeks, on or about April 20, 2011, AEDC and NPDC entered into SAAs for OMLs 26 and 42.  These SAAs were signed by OMOKORE on behalf of AEDC.

39.     Approximately one month later, on or about May 25, 2011, AEDC and NPDC entered into two more SAAs for OMLs 30 and 34.  These SAAs were also signed by OMOKORE on behalf of AEDC.  (The four SAAs for OMLs 26, 30, 34, and 42 are herein collectively referred to as the "Forcados SAAs.")

40.     NPDC's award of the Forcados SAAs to AEDC was done with the knowledge and support of ALISON-MADUEKE and at her direction.  For example, in a recorded conversation between ALISON-MADUEKE and ALUKO, ALISON-MADUEKE acknowledged that "we stuck our necks out regarding the SAA and we supported it."  *See infra* ¶ 118.

41.     A February 2014 report prepared by the then-governor of the Central Bank of Nigeria determined that AEDC "had neither the technical expertise nor the capital to develop the joint venture, but [was] none-the-less able to lift crude and retain the proceeds . . . up to 70% of the profit of the Joint Venture."  The report concluded that the arrangement was set up "for the purpose of acquiring assets belonging to the [Federal Republic of Nigeria] and transferring the income to private hands."

**(1)     Terms of the Forcados SAAs**

42.     The Forcados SAAs required AEDC to pay non-recoverable entry fees prior to the SAAs' taking effect.  The value of the entry fees was to be determined based on the estimated probable oil and gas reserves within the area covered by the Forcados OMLs.

43.     In addition, the Forcados SAAs each required AEDC to pay $350,000 per year to NPDC for the first five years of the agreements.  These funds were to be used for the provision of training facilities for NPDC staff.

44.     Finally, the Forcados SAAs required AEDC to "provide all the funds required for NPDC's 55% share of Petroleum Operating Costs."  Upon information and belief, NPDC's share of the operating costs for the Forcados OMLs, during the period from March 2011 through December 2015, was at least $1,400,000,000.

45.     In return for meeting its obligations under the Forcados SAAs, AEDC would be entitled to recover the cost of financing NPDC's share of the operating costs (as described in the preceding paragraph) and would be further entitled to a share of NPDC's profit as determined by profit-sharing formulae contained in the SAAs.

46.     AEDC's entitlements were payable in-kind.  That is, AEDC would receive allocations of available oil sufficient to cover the amounts due as cost-recovery and profit.

**(2)     AEDC's Performance Under the Forcados SAAs**

47.     Upon information and belief, AEDC substantially failed to perform under the Forcados SAAs.  In particular, upon information and belief, AEDC did not fulfill its requirement to fund training facilities for NPDC staff, leading to an outstanding obligation of approximately $5,600,000.

48.     Furthermore, AEDC failed to cover NPDC's share of the Forcados operating costs.  Upon information and belief, of the more than $1,400,000,000 required to finance such costs, AEDC made contributions of only approximately $305,108,522.43.

49.     Despite AEDC's failure to fulfil its obligations under the Forcados SAAs, AEDC was, upon information and belief, allocated and permitted to lift and sell, for its own benefit, twenty-one cargoes of crude oil valued at approximately $677,238,673.

**C.     ALUKO, OMOKORE, and Others Conspire to Purchase £11,530,000 Worth of London Real Estate for the Benefit of ALISON-MADUEKE**

50.     Concurrent with the negotiations for and the award of the Forcados SAAs, ALUKO and OMOKORE, acting in concert with CO-CONSPIRATORS #1 and #2, purchased and refurbished several multi-million dollar properties in the London area for the benefit of ALISON-MADUEKE and her family members.  ALUKO, OMOKORE, and CO-CONSPIRATORS #1 and #2 provided these properties to ALISON-MADUEKE for the corrupt purpose of inducing her to use her influence within the Ministry of Petroleum Resources, the NNPC, and the NPDC to direct the award of business opportunities to entities under their control and beneficial ownership, including the award of the Forcados SAAs to AEDC.

**(1)     96 Camp Road, Gerrards Cross, Buckinghamshire, SL9 7PB**

51.     On or about January 27, 2011, *i.e.*, less than two months before AEDC officially approached NPDC about the first of the Forcados SAAs, a Seychelles company named Miranda International Ltd. purchased a property known as "the Falls" for £3,250,000.  The Falls is located just outside London at 96 Camp Road, Gerrards Cross, Buckinghamshire SL9 7PB.

52.     Miranda International Ltd. is beneficially owned by OMOKORE.

53.     ALUKO engaged a construction company (the "Construction Company") to upgrade and maintain the plumbing, electrical, air conditioning, and audio-visual systems at the Falls.

54.     OMOKORE and ALUKO purchased and improved the Falls for the exclusive use of ALISON-MADUEKE and her family.

55.     A mobile telephone recovered at the known residences of ALISON-MADUEKE and her mother contained digital photographs of ALISON-MADUEKE present inside the Falls.

56.     Furthermore, during the relevant period, ALISON-MADUEKE—who was addressed at the property as "the Madam"—was the only person who occupied the property.

57.     Individuals who provided services at the Falls addressed its occupant as "the Madam" or were told that the person they worked for was known as "the Madam."

58.     Finally, on or about October 8, 2013, ALUKO used his American Express card to purchase two identical exercise machines at Harrods in London.  The machines were purchased for £10,926 each.  One was to be delivered to the known London address of ALISON-MADUEKE; the other was to be delivered to the Falls.

**(2)     39 Chester Close North, London NW1 4JE**

59.     On or about March 24, 2011—*i.e.*, just four days before ALUKO met with NPDC officials to discuss AEDC's interest in an SAA—a British Virgin Islands company called Mortlake Investments Ltd. was used to purchase real property at 39 Chester Close North, London NW1 4JE ("39 Chester Close North") for £1,730,000.

60.     Mortlake Investments Ltd. is beneficially owned by ALUKO.

61.     The real estate company Daniel Ford & Co. assisted in the purchase of 39 Chester Close North.  The same company assisted in the purchase of additional properties as detailed below.

62.     ALUKO engaged the Construction Company to undertake extensive alterations and renovations at 39 Chester Close North, including the installation of an elevator.  An employee of the Construction Company ("Construction Company Employee #1") has stated that the intended occupants of 39 Chester Close North were ALISON-MADUEKE's mother and son.  Construction

Company Employee #1 personally met ALISON-MADUEKE on at least two occasions at the property and, on one of those occasions, ALISON-MADUEKE selected stone flooring and countertops to be installed in the bathrooms.

63.     At some point in 2015, Construction Company Employee #1 was informed that ALISON-MADUEKE's mother and son would not be moving into 39 Chester Close North after all, and the Construction Company was instructed to remove the elevator and return the property to its original condition.  The property was sold on or about July 22, 2015, for £2,224,000.

**(3)     58 Harley House, Marylebone Road, London NW1 5HL**

64.     On or about March 28, 2011—*i.e.*, the same day ALUKO was meeting with NPDC officials to discuss AEDC's interest in an SAA—a Seychelles company, Rosewood Investments Ltd., was used to purchase real property at 58 Harley House, Marylebone Road, London NW1 5HL ("58 Harley House") for £2,800,000.

65.     Rosewood Investments Ltd. is beneficially owned by CO-CONSPIRATOR #2.

66.     The same real estate agency used to purchase 39 Chester Close North, *i.e.*, Daniel Ford & Co., assisted in the purchase of 58 Harley House.

67.     As with 39 Chester Close North, ALUKO engaged the Construction Company to provide renovation services at 58 Harley House.  On or about August 9, 2011, a second employee of the Construction Company ("Construction Company Employee #2") forwarded by email to ALUKO design plans for the kitchen at 58 Harley House.  ALUKO subsequently forwarded this email, including the design plans, to ALISON-MADUEKE.

68.     In addition, Construction Company Employee #1 was introduced to ALISON-MADUEKE at 58 Harley House, on which occasion the employee was told ALISON-MADUEKE was "the architect."

**(4)** **Flat 5 Park View, 83-86 Prince Albert Road, London NW8 7RU**

69.     On or about March 29, 2011—*i.e.*, the day after ALUKO met with NPDC officials to discuss AEDC's interest in an SAA—another Seychelles company called Colinwood Ltd. was used to purchase real property at Flat 5 Park View, 83-86 Prince Albert Road, London NW8 7RU ("Flat 5 Park View") for £3,750,000.  The purchase was financed, in part, by a loan obtained from FBN Bank (UK) Ltd. by CO-CONSPIRATOR #1.

70.     The same real estate company used to purchase 39 Chester Close North and 58 Harley House, *i.e.*, Daniel Ford & Co., also assisted in the purchase of Flat 5 Park View.

71.     As with both 39 Chester Close North and 58 Harley House, ALUKO engaged the Construction Company to perform significant renovations at Flat 5 Park View.  Construction Company Employee #1 personally met ALISON-MADUEKE at Flat 5 Park View where she was present for a discussion of interior design plans.  In addition, design plans for Flat 5 Park View were later found at the known London residence of ALISON-MADUEKE's mother.

**D.     Living and Lifestyle Expenses for ALISON-MADUEKE**

**(1)     Rental Payments**

72.     Beginning in August 2011 and continuing through January 2014, ALUKO and a company beneficially owned by him, Tracon Investments Ltd. ("Tracon"), made a total of at least £537,922 in rental payments for two central London residences both located at 22 St. Edmunds Terrace, London NW8 7QQ.  The first residence, Flat 19, was occupied by ALISON-MADUEKE during this time period.  The second residence, Flat 6, was occupied by ALISON-MADUEKE's mother during this time period.

73.     The rental payments were made in the following approximate amounts, on or about the following dates, from the following payors:

| TABLE 1 | | |
|---|---|---|
| **Date** | **Payor** | **Amount** |
| Aug. 30, 2011 | ALUKO | £49,000.00 |
| Dec. 14, 2011 | ALUKO | £10,216.00 |
| Dec. 14, 2011 | ALUKO | £44,811.00 |
| Feb. 24, 2012 | ALUKO | £39,347.50 |
| May 11, 2012 | ALUKO | £29,900.00 |
| May 11, 2012 | ALUKO | £39,347.50 |
| Sept. 12, 2012 | ALUKO | £87,075.00 |
| Feb. 4, 2013 | Tracon | £30,375.00 |
| Mar. 28, 2013 | ALUKO | £29,900.00 |
| Mar. 28, 2013 | ALUKO | £39,375.00 |
| June 21, 2013 | ALUKO | £30,375.00 |
| Sept. 30, 2013 | ALUKO | £70,000.00 |
| Jan. 22, 2014 | Tracon | £8,300.00 |
| Jan. 22, 2014 | Tracon | £29,900.00 |
| **TOTAL** | | **£537,922.00** |

74.     Upon information and belief, the above payments were made corruptly by, on behalf of, or at the direction of ALUKO for the purpose of benefiting ALISON-MADUEKE and her mother in return for ALISON-MADUEKE's having improperly influenced the award of the Forcados SAAs to AEDC and in anticipation of or in return for her improperly influencing the award of the Brass SAA, *see infra* ¶¶ 105-117, to AEDC and AEBD.

(2)      **Transportation Services**

75.      During the period from at least December 2012 through at least July 2014, ALUKO and his beneficially-owned company TENKA made at least £393,274.32 in payments to a car hire company (the "Chauffeur Company").   During that same time period, a company beneficially owned by OMOKORE, Energy Property Development Ltd., paid at least £4,424.40 to the Chauffeur Company.

76.      The payments were made to the Chauffeur Company in the following approximate amounts, on or about the following dates, by the following payors:

| TABLE 2 | | |
|---|---|---|
| **Date** | **Payor** | **Amount** |
| Dec. 28, 2012 | ALUKO | £6,171.06 |
| Jan. 11, 2013 | TENKA | £6,115.92 |
| Feb. 14, 2013 | TENKA | £10,664.50 |
| Mar. 8, 2013 | TENKA | £25,000.97 |
| Apr. 8, 2013 | TENKA | £27,999.30 |
| June 7, 2013 | TENKA | £25,524.51 |
| June 11, 2013 | Energy Prop. Dev. | £1,475.22 |
| June 13, 2013 | Energy Prop. Dev. | £1,072.02 |
| July 8, 2013 | ALUKO | £77,605.78 |
| July 17, 2013 | Energy Prop. Dev. | £1,877.16 |
| Oct. 15, 2013 | ALUKO | £74,420.32 |
| Dec. 3, 2013 | TENKA | £4,410.48 |
| July 28, 2014 | TENKA | £35,362.48 |

| July 29, 2014 | TENKA | £99,999.00 |
|:---:|:---:|:---:|
| **TOTAL** | | **£397,698.72** |

77.     Upon information and belief, the above payments were made corruptly by, on behalf of, or at the direction of ALUKO and OMOKORE for the benefit of ALISON-MADUEKE and/or her family, in return for ALISON-MADUEKE's having improperly influenced the award of the Forcados SAAs to AEDC and in anticipation of or in return for her improperly influencing the award of the Brass SAA (*see infra*) to AEDC and AEBD.

78.     In particular, the director of the Chauffeur Company has stated that in or around June 2014 he was assaulted in the hallway outside of ALISON-MADUEKE's known residence at Flat 19, 22 St. Edmunds Terrace, London NW8 7QQ, by two men known by the director to be ALISON-MADUEKE's associates.   This assault occurred as the director of the Chauffeur Company was attempting to deliver a letter concerning approximately £224,000 in unpaid services provided by his company to ALISON-MADUEKE.

79.     The director of the Chauffeur Company has further stated that, upon hearing the commotion, ALISON-MADUEKE herself appeared and instructed her associates to settle the unpaid bill.  As the preceding table indicates, roughly one month after the hallway assault, TENKA paid a total of £135,361.48 to the Chauffeur Company.

**E.     Furniture Purchases in Houston, Tex. for the Benefit of ALISON-MADUEKE**

**(1)     Purchases by OMOKORE and CO-CONSPIRATOR #1**

80.     An employee of a furniture store located within the Southern District of Texas in Houston, Tex., ("Houston Furniture Store #1") has stated that ALISON-MADUEKE visited his showroom on multiple occasions.   During those visits, ALISON-MADUEKE would identify specific items of interest to her, which the employee ("Furniture Store Employee") would

photograph.  During her various visits to Houston, ALISON-MADUEKE would spend many hours over the course of two or three days reviewing furniture in Houston Furniture Store #1.  Afterward, the Furniture Store Employee would visit ALISON-MADUEKE at her hotel room in Houston to review the photographed items.  ALISON-MADUEKE would then narrow down the selections to those she wished to be purchased.

81.     ALISON-MADUEKE's purchases were always paid for by someone else.  In particular, the Furniture Store Employee recalled that CO-CONSPIRATOR #1 was the first person to visit the store and to pay for ALISON-MADUEKE's selections.

82.     Upon information and belief, ALISON-MADUEKE was present in Houston, Tex., to deliver a keynote address at Rice University in late September 2010, departing Houston for Nigeria on September 29, 2010.  This trip occurred roughly five months after ALISON-MADUEKE assumed her role as Minister for Petroleum Resources and roughly two months after the incorporation of AEDC.

83.     Coinciding with ALISON-MADUEKE's visit to Houston, CO-CONSPIRATOR #1 charged $12,867 and $25,000 in two separate transactions at Houston Furniture Store #1 on or about September 27, 2010.  On or about October 7, 2010, CO-CONSPIRATOR # 1 charged an additional $3,022 at Houston Furniture Store #1.  Upon information and belief, these purchases comprised items selected by ALISON-MADUEKE and were intended for her benefit.

84.     In or around the same time as the purchases made at Houston Furniture Store #1, CO-CONSPIRATOR #1 also made significant purchases at another Houston furniture showroom ("Houston Furniture Store #2").  In particular, a Nevada-based limited partnership under the control of CO-CONSPIRATOR #1 wired a total of $197,600 to Houston Furniture Store #2 in two separate transactions on or about September 30, 2010, and October 1, 2010.  Upon information

and belief, these payments were in settlement of approximately $200,000 worth of purchases signed for by OMOKORE on or about September 27, 2010, at Houston Furniture Store #2.

85.     Subsequently, on October 7, 2010, Houston Furniture Store #2 drew up two additional sales invoices in OMOKORE's name in the total amount of $23,703.50.  On the following day, October 8, 2010, CO-CONSPIRATOR #1 emailed photographs of the items listed on these additional sales invoices directly to ALISON-MADUEKE.  On October 9, 2010, ALISON-MADUEKE responded by email to CO-CONSPIRATOR #1:  "thx.  cabinet is the correct one."

86.     Subsequently, on October 13, 2010, CO-CONSPIRATOR #1 authorized Houston Furniture Store # 2 to charge his Nevada company another $23,703.50 as payment for the additional furniture purchases made in OMOKORE's name and discussed, via email, directly with ALISON-MADUEKE.

87.     Upon information and belief, in October 2010 CO-CONSPIRATOR #1 arranged with Houston Furniture Store #1 to combine the recent purchases made by himself and OMOKORE from both stores and to ship the merchandise to OMOKORE in Lagos, Nigeria.

88.     At least one of the items purchased in OMOKORE's name, and paid for by CO-CONSPIRATOR #1, has been matched by vendor number, item number, and store-issued control number to furniture discovered in ALISON-MADUEKE's residence in Abuja, Nigeria.

89.     Upon information and belief, OMOKORE and CO-CONSPIRATOR #1 made their purchases at Houston Furniture Stores #1 and #2 in and around September and October 2010 and subsequently arranged for the shipment of certain of those purchases to Nigeria for the corrupt purpose of benefitting ALISON-MADUEKE and inducing her to improperly influence the award of, *inter alia*, the Forcados SAAs to AEDC.

20

(2)    **Purchases by CO-CONSPIRATORS #2 and #3**

90.    On or about May 3, 2011, CO-CONSPIRATOR #2 purchased a total of $53,636.79 worth of furniture from Houston Furniture Store #2.  These purchases included, among other things, the following items:

| TABLE 3 | | |
|:---:|:---:|:---:|
| **Control No.** | **Description** | **Price (w/o tax)** |
| 1564774 | Luigi XVI Sideboard | $10,829.00 |
| 1373385 | George III Console | $2,999.00 |
| 1479702 | Jappaned Secretaire | $5,508.00 |

91.    CO-CONSPIRATOR #2 returned to Houston Furniture Store #2 on or about the following day, *i.e.*, May 4, 2011, and purchased another $53,890.08 worth of merchandise.

92.    On March 31, 2012, CO-CONSPIRATOR #3 purchased $27,068.99 worth of merchandise at Houston Furniture Store #2.  On or about April 4, 2012, CO-CONSPIRATOR #3 returned and purchased another $5,756.73 worth of merchandise from the same store.

93.    In or around May 2012, the items purchased by CO-CONSPIRATORS #2 and #3, as described in ¶¶ 91-93, were pooled into two shipping containers and shipped to the attention of CO-CONSPIRATOR #3 in London.  The descriptions and control numbers contained on the packing lists match exactly the descriptions and control numbers on the sales records of Houston Furniture Store #2, including those specifically identified in Table 3 above.  The total value of the shipped furniture, exclusive of sales tax or shipping fees, was $123,987.

94.     On or about August 23, 2012, a representative of a U.K. moving and storage company emailed the Construction Company Employee #1 regarding "[CO-CONSPIRATOR #3]'s Containers."  Construction Company Employee #1 forwarded this email to ALUKO.

95.     Subsequently, the Construction Company assisted in the delivery of multiple items of furniture to 58 Harley House, including the three items identified in Table 3 above.

96.     Thus, ALUKO and CO-CONSPIRATORS #2 and #3 conspired to and did purchase furniture from Houston Furniture Store #2 and arranged for the shipment and delivery of some portion of those items to 58 Harley House, a property that ALUKO and CO-CONSPIRATORS #2 and #3 had previously purchased and refurbished for the benefit and use of ALISON-MADUEKE and her family.

97.     Upon information and belief, ALUKO and CO-CONSPIRATORS #2 and #3 undertook to purchase and deliver furniture to 58 Harley House for the corrupt purpose of inducing ALISON-MADUEKE to use her influence, or rewarding her for having used her influence, within the Nigerian Ministry for Petroleum Resources, NNPC, and NPDC to direct the award of business opportunities to entities under the control of ALUKO and CO-CONSPIRATORS #2 and #3, including the award of the Forcados SAAs and the Brass SAA to AEDC and AEBD.

**(3)    Purchases by ALUKO**

98.     The Furniture Store Employee further recalled that ALUKO visited the Houston store to pay for some of ALISON-MADUEKE's selections, and the Furniture Store Employee kept ALUKO's cellular telephone number in his own telephone under the descriptor "Kola Aluko Madame D."

99.      On or about May 4, 2012, ALUKO purchased $446,607.29 worth of goods from Houston Furniture Store #1.  Later that month, in payment for his May 4, 2012, purchases, ALUKO

wired $461,500 to Houston Furniture Store #1 from a bank account ending in -090038 held in his name at LGT Bank (Schweiz) AG in Switzerland (the "LGT -090038 Account").

100.    Also on May 4, 2012, ALUKO purchased an additional $262,091.47 worth of furniture at Houston Furniture Store #2.  On June 1, 2012, ALUKO wired $280,595.81 to Furniture Store #2 from his LGT -090038 Account as payment for the purchases.

101.    In or around March 2013, Houston Furniture Store #1 arranged a shipment of furniture comprising a subset of items from ALUKO's May 2012 purchases at both Houston Furniture Store #1 and Furniture Store #2.  The shipment was sent from Houston to Lagos, Nigeria. The consignee was Chijioke Isiolu.  Upon information and belief, Isiolu is a Nigerian attorney who represents OMOKORE.

102.    At least one item of furniture purchased by ALUKO as part of his May 4, 2012, purchases from Houston Furniture Store #2 has been matched by vendor number, item number, and store-issued control number to furniture discovered in the Abuja residence of ALISON-MADUEKE.

103.    Upon information and belief, ALUKO made his May 2012 purchases at Houston Furniture Stores #1 and #2 and arranged for the shipment of certain of those purchases to Nigeria in or around March 2013 for the corrupt purpose of benefitting ALISON-MADUEKE in return for ALISON-MADUEKE's having improperly influenced the award of the Forcados SAAs to AEDC and in anticipation of or in return for her improperly influencing the award of the Brass SAA, *see infra* ¶¶ 105-117, to AEDC and AEBD.

## F.    The Brass SAA (OMLs 60, 61, 62, and 63)

104.    On or about December 17, 2012—*i.e.*, while ALUKO, OMOKORE, and CO-CONSPIRATORS #1, #2, and #3 were in the midst of purchasing and refurbishing multiple high-

value properties for the use and benefit of ALISON-MADUEKE and otherwise financing her living and lifestyle expenses—NPDC awarded to AEDC a new SAA for OMLs 60, 61, 62, and 63 (the "Brass SAA").

105.    On or about February 14, 2013, AEDC entered into a novation agreement pursuant to which it transferred all of its rights and obligations under the Brass SAA to AEBD.

**(1)    Terms of the Brass SAA**

106.    The Brass SAA, like the earlier Forcados SAAs, imposed certain obligations on AEBD and, in return, entitled AEBD to a share of the oil and gas produced under the Brass OMLs.

107.    In particular, the Brass SAA required AEBD to pay a non-recoverable entry fee. Per the terms of the SAA, the value of the entry fee was to be determined based on the estimated probable oil and gas reserves within the area covered by the Brass OMLs.  Upon information and belief, the entry fee should have been at least $120,000,000.

108.    Per the terms of the Brass SAA, commencement of the agreement was contingent "upon the payment of the entry fee by ATLANTIC," *i.e.*, by AEDC or, after the novation, AEBD.

109.    In addition, the Brass SAA required AEBD to pay $350,000 per year to NPDC for the first five years of the agreement for the provision of training facilities for NPDC staff.

110.    Finally, the Brass SAA required AEBD "to provide all funds required by NPDC's 60% share of Petroleum Operating Costs."  Upon information and belief, NPDC's share of the operating costs for the Brass OMLs, during the period from December 2012 through December 2015, was at least $1,700,000,000.

111.     In return for meeting its obligations under the Brass SAA, AEBD would be entitled to recover the cost of financing NPDC's share of the operating costs (as described in the preceding

paragraph) and would be further entitled to a share of NPDC's profit as determined by a profit-sharing formula contained in the SAA.

112.    AEBD's entitlements were payable in kind.  That is, AEBD would receive allocations of available oil sufficient to cover the amounts due as cost-recovery and profit.

**(2)    AEBD's Performance Under the Brass SAA**

113.    Both AEBD and AEDC failed entirely to meet their obligations under the Brass SAA.  Neither company ever paid the required entry fee; neither company ever made payments towards the NPDC training facilities; and neither company provided any funds to finance NPDC's share of the operating costs of the OMLs.

114.    Despite this complete failure of AEBD and AEDC to meet any of their obligations under the Brass SAA, NPDC nevertheless allocated to AEBD fifteen cargoes of oil, comprising more than 7,000,000 barrels of crude oil.  Over the course of a year, AEBD subsequently sold these allocations to a third-party company for $811,297,883.11, collectively.

115.    Rather than use the proceeds of its oil liftings to meet its obligations under the Brass SAA, AEBD retained the revenues and diverted them for the benefit of ALUKO and OMOKORE, and, upon information and belief, for the benefit of ALISON-MADUEKE.

116.    Upon information and belief, neither ALUKO nor OMOKORE ever intended to fulfill their or their companies' obligations under the Brass SAA but, nevertheless, with the assistance of ALISON-MADUEKE, induced NPDC to enter into the agreement under the false and fraudulent pretense that they intended to and would fulfill their obligations.

### G.    ALISON-MADUEKE's Recorded Conversation with ALUKO

117.    On or about May 14, 2014, ALISON-MADUEKE recorded a conversation between herself and ALUKO.   In the conversation, ALISON-MADUEKE acknowledged her role in steering SAAs to AEDC.

> ALISON-MADUEKE:    You and Jide [*i.e.*, OMOKORE] had some of the most support that we could possibly give.  At a time when we're not doing anything else, we stuck our necks out regarding the SAA and we supported it.  [INAUDIBLE] How the two of you have ruined it is incredulous and incredible to all of us.
>
> I spoke to you several times about your general behavior, acquisition of assets, etc., asking you to be a bit more careful because [INAUDIBLE] will start following you.  I remember we had this open discussion more than once.  You kept telling me that there was no issue because you did it in a certain way, you did it in a certain—and I kept telling you that it doesn't matter how you do it.  Once you start acquiring, acquiring, acquiring at a certain level, then you'll be—whether you like it or not, whether it was done in the most transparent—you understand?—manner or not, because they will want to trace where it came from.  This is an age of terrorism.

118.    In particular, ALISON-MADUEKE criticized ALUKO for the purchase of the yacht GALACTICA STAR.

> ALISON-MADUEKE:    If you want to hire a yacht, you lease it for two weeks or whatever.  You don't go and sink funds into it at this time when Nigerian oil and gas sector is under all kinds of watch, as we have been for some time, and where Atlantic [*i.e.*, AEDC and/or AEBD] itself has been the subject of all kinds of speculation.

119.    Subsequently, ALISON-MADUEKE confronted ALUKO with rumors she had heard of his ability to blackmail her.

> ALISON-MADUEKE:    I said tell him [*i.e.*, ALUKO] to bring everything out, and then you know what will happen?  No problem, I will be happy to escort all of you to jail along with myself.  I said, in fact, you'll

be shocked by what I will do.  Because when it comes to that, I will come out and tell the Nigerian people this is what happened.

Oh, yes, I will blame myself, but it [INAUDIBLE] place and everything.  Anything they want to say, I am happy to go.  But I will come out openly and say it so that they can judge me openly.  And then all of us go and sit on the gate.  Let us see who survived [INAUDIBLE], me or you.

120.     Later, ALISON-MADUEKE acknowledged the furniture purchased on her behalf, and indicated the total value of it could approach $4,000,000.

ALISON-MADUEKE:     The furniture they gave me didn't come to more than four million dollars, altogether.  [INAUDIBLE] it is truth.  I was with [INAUDIBLE].

## H.     Laundering of Corruptly Acquired Proceeds into and through the United States

121.     Upon information and belief, AEDC and AEBD sold the oil-lifting allocations assigned to them under the Forcados and Brass SAAs to third-party oil trading companies and used the proceeds of those sales to purchase, *inter alia*, the Defendant In Rem.  The following paragraphs detail representative transactions in which AEDC and AEBD received payments from third-party traders in return for allocations of crude oil.

### (1)     Taleveras Payments

122.     Shortly after the award of the Forcados SAAs, ALUKO began to receive at his personal LGT -090038 Account a stream of payments from the Taleveras Group of Companies and its affiliates, including Taleveras Trading Ltd. and Taleveras Petroleum Trading BV (collectively, "Taleveras").   Over the course of six months, these payments totaled nearly $15,000,000.

123.     Taleveras is a Nigerian-based oil trading company that was assigned the oil-lifting rights of companies controlled by CO-CONSPIRATORS #1 and #3.

124.    The founder and chairman of Taleveras is Igho Sanomi ("Sanomi").  Sanomi is also

a director of and a 30% shareholder in Lengard Projects Ltd. ("Lengard"), a Nigerian corporation.

Notations recorded alongside the wires that Taleveras sent to ALUKO indicate the payments were

made in connection with a joint venture between Lengard and AEDC concerning the Forcados

SAAs.

125.    The Taleveras payments are summarized in Table 4 below.

| TABLE 4 | | | | |
|---|---|---|---|---|
| <u>Date</u> | <u>Amount</u> | <u>From</u> | <u>To</u> | <u>Remittance Notes</u> |
| July 12, 2011 | $1,500,000 | Taleveras Group of Cos. | ALUKO LGT -090038 Account | RFB LENGARD JVA |
| July 14, 2011 | $1,000,000 | Taleveras Group of Cos. | ALUKO LGT -090038 Account | FOR FIRST INSTALLMENT DUE |
| July 20, 2011 | $1,000,000 | Taleveras Trading Ltd. | ALUKO LGT -090038 Account | RFB JOINT CONRACT VENTURE WITH LENGARD PROJECT |
| Aug. 15, 2011 | $1,000,000 | Taleveras Group of Cos. | ALUKO LGT -090038 Account | JOINT VENTURE CONTRACT WITH LENGARD |
| Aug. 15, 2011 | $650,000 | Taleveras Group of Cos. | ALUKO LGT -090038 Account | JOINT VENTURE CONTRACT WITH LENGARD |

| Sept. 12, 2011 | $1,000,000 | Taleveras Trading Ltd. | ALUKO LGT -090038 Account | JOINT CONTRACT VENTURE WITH LENGARD PROJECT |
|---|---|---|---|---|
| Sept. 16, 2011 | $1,600,000 | Taleveras Trading Ltd. | ALUKO LGT -090038 Account | KOLA ALUKO AND LENGARD AGREEMENT |
| Oct. 5, 2011 | $1,500,000 | Taleveras Petroleum Trading BV | ALUKO LGT -090038 Account | REF KOLAWOLE ALUKO AND LENGARD PROJECTS AGREEMENT FOR OML |
| Oct. 11, 2011 | $500,000 | Taleveras Group of Cos. | ALUKO LGT -090038 Account | RFB PAYMENT FOR LENGARD JVA WITH KOLAWOLE ALUKO BEING JOIN CONTRACT BETWEEN LENGARD PROJECTS LTD AND MRKOLAWOLE ALUKO |
| Nov. 14, 2011 | $2,000,000 | Taleveras Group of Cos. | ALUKO LGT -090038 Account | RFB FINAL PAYMENT ON AGREEMENT FOR OMLS [BANK ACCOUNT NO.] |
| Dec. 7, 2011 | $1,600,000 | Taleveras Petroleum Trading BV | ALUKO LGT -090038 Account | REF KOLAWOLE ALUKO AND LENGARD PROJECTS AGREEEMENT FOR OML 30 34 42 26 |
| Jan. 3, 2012 | $600,000 | Taleveras Petroleum Trading BV | ALUKO LGT -090038 Account | REF FINAL PAYMENT VENTURE LENGARD PROJECTS LTD |

| Jan. 10, 2012 | $1,000,000 | Taleveras Petroleum Trading BV | ALUKO LGT -090038 Account | REF FINAL PAYMENT KOLAWOLE ALUKO AND LENGARD PROJECTS AGREEMENT FOR OML 30 34 42 26 |
|---|---|---|---|---|
| **TOTAL** | **$14,950,000** | | | |

126.     Upon information and belief, the sums identified in Table 4 were paid to ALUKO in return for an assignment to Taleveras and/or Lengard of AEDC's rights to lift oil under the corruptly acquired Forcados SAAs.

127.     Each of the transactions identified in Table 4 were transferred into and out of correspondent bank accounts at a financial institution which processes its U.S. dollar wire transactions through Newark, N.J.

**(2)     Arcadia Payments**

128.     Upon information and belief, AEDC entered into an agreement with the Arcadia Group and/or its affiliates and subsidiaries (collectively "Arcadia"), according to which Arcadia loaned money to AEDC.[1]   In return, Arcadia was repaid with assignments of AEDC's crude oil liftings under the Forcados SAAs.

129.     In particular, two months after the last payment from Taleveras, as detailed above, Arcadia Energy (Suisse) SA and Arcadia Petroleum Ltd. began making payments to an account held in the name of AEH at LGT Bank (Schweiz) AG ending in -108031 (the "LGT -108031 Account").   These payments are summarized in Table 5 below.

---

[1] According to its website, Arcadia is a "global commodity trading firm covering oil, agricultural, gas and power markets."

| **TABLE 5** | | | |
|---|---|---|---|
| **Date** | **Amount** | **From** | **To** |
| Apr. 18, 2012 | $10,000,000.00 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| May 14, 2012 | $1,240,636.73 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| June 26, 2012 | $4,182,119.86 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| July 23, 2012 | $2,369,202.26 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| July 24, 2012 | $1,275,896.52 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| Aug. 17, 2012 | $2,962,828.96 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| Sept. 17, 2012 | $25,000,000.00 | Arcadia Petroleum Ltd. | AEH LGT -108031 Account |
| Sept. 17, 2012 | $25,000,000.00 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| Sept. 18, 2012 | $2,091,915.00 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| Jan. 8, 2013 | $23,419,427.59 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| Jan. 10, 2013 | $1,603,484.35 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| Feb. 4, 2013 | $2,000,000.00 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| Feb. 15, 2013 | $1,114,975.99 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
| Feb. 21, 2013 | $6,000,000.00 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |

| Feb. 27, 2013 | $1,750,000.00 | Arcadia Energy (Suisse) SA | AEH LGT -108031 Account |
|---|---|---|---|
| **TOTAL** | **$110,010,487.26** | | |

130.    Each of the transactions identified in Table 5 were transferred into and out of correspondent bank accounts at a financial institution which processes its U.S. dollar wire transactions through Stamford, Conn.

**I.    The Purchase of the Defendant In Rem**

131.    Purchases made by or for ALUKO's benefit during the period of the SAAs grossly outstrip his known net worth and legitimate income.  Although Aluko once owned an oil-trading company in Nigeria, he was known as a small-time trader.  Likewise, between 2007 and 2011, Aluko was employed by Seven Energy International Ltd. where his annual salary was only approximately $500,000, plus bonus.

132.    Nevertheless, during the period from March 2012 through January 2015, ALUKO purchased more than $100 million dollars' worth of real property in the United States and an $82 million luxury yacht.

133.    Upon information and belief, ALUKO, OMOKORE, and others transferred the proceeds of the Forcados and Brass SAAs into accounts held in their names or in the names of entities under their control and laundered these proceeds into and through the United States, including for the purchase of the Defendant In Rem.

**(1)    THE DEFENDANT IN REM**

**a.  The Purchase of the Defendant In Rem By and For the Benefit of ALUKO**

134.    On March 3, 2012, AEH's LGT-108031 USD account wired $10,600,000 to ALUKO's LGT-090038 USD account.  The funds used to source this wire originated from a credit

of $20,000,000 to AEH's LGT-108031 USD account from Credit Suisse AG, Paradeplatz 8, CH8001, Zurich (ordering customer) at Credit Suisse AG, 8070 Zurich referencing "SGAX 322-084324". These funds were the proceeds of a Documentary Credit to the account of Arcadia Energy (Suisse) SA, Route De Longeraise 7, 1110 Morges, Switzerland related to a bill of laden for Forcados Blend Crude Oil between Arcadia Energy (Suisse) SA and Atlantic Energy Drilling Concepts Nigeria Limited.

135.    On March 8, 2012, AEH's LGT-108031 USD account wired $17,500,000 to Aluko's LGT-090038 USD account. The funds used to source this wire originated from a credit of $33,499,960 to AEH's LGT-108031 USD account from the Atlantic Energy Drilling Concept Ltd. account held at First Bank Nigeria PLC, Lagos, Nigeria.

136.    On March 16, 2012, ALUKO wired $500,000.00 ($500,026.98 including wire fee) from his LGT-090038 USD account to Sail North Hollywood Escrow Trust Account, account number 82335738, East West Bank, referencing Escrow No: 20129446-JFJ as down-payment to purchase 755 Sarbonne Road.

137.    On April 12, 2012, ALUKO wired $25,175,000.00 ($25,175,027.33 including wire fee) from his LGT-090038 USD account to Chicago Title Company, account number 1235150737, held at Bank of America, referencing Order No 126745967-X59 as final payment to purchase 755 Sarbonne Road. Aluko provided handwritten instructions to LGT Bank to wire these funds.

138.    Also on April 12, 2012, ALUKO wired $75,000.00 ($75,027.33 including wire fee) from his LGT-090038 USD account to Chicago Title Company, account number 1235150737,

held at Bank of America, for "additional home insurance" for 755 Sarbonne Road.  ALUKO provided handwritten instructions to LGT Bank to wire these funds.

139.    On April 24, 2012, Sail North Hollywood Escrow received a $25,194,204.00 wire in its account East West Bank from CTC (Chicago Title Company) Los Angeles account held at Bank of America to close on the purchase of the 755 Sarbonne Road property on behalf of Wadlaks Investments Inc.  Wadlaks Investments Inc. is a California corporation that is a wholly owned subsidiary of EARNSHAW.  As noted above, EARNSHAW is wholly owned by ALUKO.

140.    Also on April 24, 2012 a deed was recorded in Los Angeles County transferring 755 Sarbonne Road from Sarbonne Development LLC, a California corporation, to Wadlaks Investments Inc.

141.    On May 14, 2012, ALUKO wired $250,000.00 ($250,026.80 including wire fee) from his LGT-090038 USD account to Canon Business Properties Inc., account number 123591887, held at City National Bank, for payment referencing "755 Sarbonne".

### b.  The Subsequent Sale of the Defendant *in Rem*

142.    On April 26, 2016 Wadlaks Investments Inc, a California corporation, transferred the Defendant In Rem to Sarbonne Estate Inc., a California corporation, for a nominal purchase price of $21,565,000.  Sarbonne Estate Inc. is a single-purpose entity wholly-owned and controlled by PRINCIPAL, who is a close business associate of ALUKO.  Indeed, PRINCIPAL owns an aircraft services company, and ALUKO is both a significant stockholder and corporate official of

that aircraft services company.  PRINCIPAL and ALUKO worked closely together on business ventures for the aircraft services company.

143.    No money changed hands on the transfer of the Defendant In Rem from Wadlaks to Sarbonne Estate Inc.  Instead, Sarbonne Estate Inc. gave Wadlaks a promissory note for the $21,565,000 purchase price, secured by a deed of trust against the Defendant In Rem.

144.    On that same day—April 26, 2016—the promissory note and deed of trust was assigned from Wadlaks to EARNSHAW.

145.     On that same day—April 26, 2016—the promissory note and deed of trust was assigned from EARNSHAW to Ness Trading and Invest Ltd., a British Virgin Islands entity.

146.    On June 6, 2016, the promissory note and deed of trust was assigned from Ness Trading and Invest Ltd. to PRINCIPAL.

147.    On June 7, 2016, the promissory note and deed of trust was assigned from PRINCIPAL to Tarwood Finance Ltd.

148.    On June 8, 2016, the promissory note and deed of trust was assigned from Tarwood Finance Ltd. back to Sarbonne Estate Inc., which deemed the promissory note satisfied.

149.    At the time this transfer occurred in April 2016, Sarbonne Estate Inc. and its beneficial owner (*i.e.* PRINCIPAL) knew and/or had reasonable cause to believe that the

Defendant In Rem was subject to forfeiture.  Their knowledge can be shown or inferred in part based on the facts set forth below.

150.    First, as stated above, PRINCIPAL was a close business associate of ALUKO. Additionally, PRINICPAL and ALUKO were at one time owners of nearby properties on Sarbonne Road, even before the transfer of 755 Sarbonne to PRINCIPAL.

151.    Second, PRINCIPAL's aircraft services company performed compliance checks on Aluko, in connection with services offered to and for ALUKO, and those compliance checks returned public news articles showing that ALUKO was suspected of money laundering and other offenses relating to ALISON-MADUEKE and the Nigerian oil industry.  These articles were published well before PRINCPAL purchased the Defendant In Rem from ALUKO through Sarbonne Estate Inc.

152.    Indeed, there were prominent press reports strongly suggesting that ALUKO had purchased the Defendant In Rem using proceeds of bribery and corruption in the Nigerian oil industry.  For example, on December 14, 2015, the New York Times published a lengthy front-page article entitled "A Mansion, A Shell Company and Resentment in Bel Air."[2]  This article included a color photograph of the Defendant In Rem, identified and discussed the Defendant In Rem by its specific address, and contained the following text:

> Mr. Aluko, it turned out, was on a buying spree. In addition to purchasing the Sarbonne Road house for $24 million, shell companies tied to him soon bought another Beverly Hills house for $14.7 million and two others in Santa Barbara for $33 million.
>
> At the time, Mr. Aluko was a beneficiary of an agreement with Nigeria's state oil company; in the first four months of 2012, the company he co-owned, Atlantic Energy, shipped $49 million in crude to the United States. But that deal came under fire back

---

[2] Available at https://www.nytimes.com/2015/12/15/us/shell-company-bel-air-mansion.html.

home amid growing questions about Mr. Aluko's friendship with the oil minister at the time, Diezani Alison-Madueke.

In 2013, the governor of Nigeria's Central Bank said billions of dollars were missing from the nation's oil revenue. Among the troubling matters was the Atlantic deal, which looked as if it "was structured in such a way that it would just rip off the country," Sanusi Lamido Sanusi, the bank governor at the time, said in a recent interview.

The deal allowed Atlantic to sell oil in exchange for paying some production costs. But subsequent investigations indicated that while Atlantic was selling oil, it was not paying its full share, according to a document read to The Times, as well as Nigerian news reports.

It did not help that Nigerians saw Mr. Aluko in news reports partying with celebrities overseas, driving racecars and buying luxury real estate. "People in the sector started wondering," said Aaron Sayne, who recently co-wrote a report on the industry for the Natural Resource Governance Institute, a nonprofit in New York. "Has the government given this company a sweetheart deal, and if so, for whose ultimate benefit?"

. . . .

Mr. Aluko's broader legal entanglements continue.  Law enforcement officials in Nigeria, Britain and the United States are examining whether the former oil minister improperly acquired funds. Among the issues being studied are the Atlantic deal and whether Mr. Aluko helped enrich the former minister, according to three people with direct knowledge of the matter.

153.   PRINCIPAL and Sarbonne Estate Inc. also were not *bona fide* purchasers for value, as they did not acquire the Defendant In Rem in an arms-length transaction with the expectation that they would provide equivalent value in return.

154.   PRINCIPAL and Sarbonne Estate Inc. have alleged that ALUKO essentially traded the Defendant In Rem for 3.5 years of owner-like use of an aircraft.  *See Sarbonne Estate Inc. v. United States of America*, No. 2:20-cv-04081, Dkt. 1 (C.D. Cal.).  However, at the time this alleged agreement was struck, ALUKO had already used the aircraft for 11 months and had incurred usage charges of only $3 million.  *Id.*, Dkt. 1, ¶ 11.  At that historical usage rate, 3.5 years of usage would be worth less than $11.5 million.  The Defendant In Rem was worth far more than $11.5 million, and this fact was known to Sarbonne Estate Inc. and PRINCIPAL at the time of the transaction.

Thus, PRINCIPAL and Sarbonne Estate, Inc. did not acquire the Defendant In Rem with the expectation that they would provide *equivalent* value in return.

155.    Furthermore, as stated above, the first 11 months of ALUKO's aircraft use occurred before the written contract involving the Defendant In Rem was signed.  As noted above, ALUKO allegedly incurred $3 million of aircraft charges during those 11 months.  However, those $3 million were incurred pursuant to an earlier *oral* contract under which ALUKO was granted owner-like use of the aircraft.  *See Sarbonne Estate Inc. v. United States of America*, No. 2:20-cv-04081, Dkt. 1-1 at p. 1.  Upon information and belief, such oral contract was not enforceable under the statute of frauds, meaning that ALUKO's $3 million debt was not collectible.  Therefore, the actual consideration that Sarbonne Estate Inc. and PRINCIPAL granted to ALUKO in exchange for the Defendant In Rem was at most $8.5 million ($11.5 million of aircraft services, minus the $3 million subset of past services that were effectively uncollectible).  $8.5 million is far less than the value of the Defendant In Rem, such that PRINCIPAL and Sarbonne Estate, Inc. did not acquire the Defendant In Rem with the expectation that they would provide *equivalent* value in return.

156.    PRINCIPAL and Sarbonne Estate Inc. also were not *bona fide* purchasers for value because their purchase of the Defendant In Rem was not done as part of an arms-length transaction. ALUKO was a close business associate of PRINCIPAL, held significant stock in PRINCIPAL's aircraft services company, and held an official position in that company.  Indeed, PRINCIPAL and ALUKO worked together on at least one new business venture for the company.  Moreover, the transaction at issue here was intimately connected to the company's core aircraft services business.

Put simply, an agreement between two corporate insiders concerning the corporation's business is not an arms-length transaction.

157.    Moreover, as noted above, the transaction at issue here was allegedly a memorialization of a prior "*oral agreement*" between ALUKO and PRINCIPAL for multi-year, multi-million dollar aircraft services.  *See Sarbonne Estate Inc. v. United States of America*, No. 2:20-cv-04081, Dkt. 1-1 at p. 1.  Arms-length parties would not strike oral agreements of such magnitude.  This further shows that ALUKO and PRINCIPAL were not arms-length parties.

158.    Upon information and belief, the sale of the Defendant In Rem from ALUKO to PRINCIPAL (through Sarbonne Estate Inc.) was a transaction in violation of 18 U.S.C. § 1956(a)(1)(B), as it was designed in whole or in part by ALUKO "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity".  This is evidenced by the use of shell companies to obscure the identities of ALUKO and PRINCIPAL, the circuitous transfer of the deed of trust, and the fact that the transaction was so lopsided (*i.e.*, the Defendant In Rem was allegedly traded for aircraft services worth so much less).

## FIRST CLAIM FOR FORFEITURE

159.    The United States incorporates by reference ¶¶ 1 through 158 above as if fully set forth herein.

160.    Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States.

161.    "Specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv), and 1956(c)(7)(D) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public

official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); (v) wire fraud (18 U.S.C. § 1343); and any felony violation of the FCPA (15 U.S.C. § 78dd-1 *et seq.*).

162.    As set forth above, the Defendant In Rem constitutes or is derived from proceeds traceable to bribery of a public official or the misappropriation, theft, or embezzlement of public funds for the benefit of a public official, in violation of the laws of Nigeria, as well as from proceeds traceable to the interstate transportation or receipt of property stolen or taken by fraud, to wire fraud, and to felony violations of the FCPA or to a conspiracy to commit one of the foregoing offenses.

163.    Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) on the grounds that it constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit a specified unlawful activity.

## SECOND CLAIM FOR FORFEITURE

164.    The United States incorporates by reference ¶¶ 1 through 163 above as if fully set forth herein.

165.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1957], or any property traceable to such property" is subject to forfeiture to the United States.

166.    Section 1957 imposes criminal penalties on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 [that] is derived from specified unlawful activity."

167.     For purposes of § 1957, "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv), and 1956(c)(7)(D) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); (v) wire fraud (18 U.S.C. § 1343); and any felony violation of the FCPA (15 U.S.C. § 78dd-1 *et seq.*).

168.     As set forth above, the Defendant In Rem was involved in, or is traceable to, monetary transactions or attempted monetary transactions involving criminally derived property of a value greater than $10,000 and, as detailed above, the funds involved in those transactions were derived from specified unlawful activity, including bribery of a public official or the misappropriation, theft, or embezzlement of public funds for the benefit of a public official, in violation of the laws of Nigeria; the interstate transportation or receipt of property stolen or taken by fraud; wire fraud; felony violations of the FCPA; or to a conspiracy to commit one of the foregoing offenses.

169.     Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in or is traceable to transactions or attempted transactions in violation of 18 U.S.C. § 1957.

## **THIRD CLAIM FOR FORFEITURE**

170.     The United States incorporates by reference ¶¶ 1 through 169 above as if fully set forth herein.

171.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property" is subject to forfeiture to the United States.

172.     Section 1956(a)(1) imposes criminal penalties on any person who:

knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity --

. . .

(B) knowing that the transaction is designed in whole or in part --

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

173.     For purposes of § 1956, "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv), and 1956(c)(7)(D) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); (v) wire fraud (18 U.S.C. § 1343); and any felony violation of the FCPA (15 U.S.C. § 78dd-1 *et seq.*).

174.     As set forth above, the Defendant In Rem was involved in, or is traceable to, financial transactions or attempted financial transactions involving funds derived from specified unlawful activity, including bribery of a public official or the misappropriation, theft, or embezzlement of public funds for the benefit of a public official, in violation of the laws of Nigeria; the interstate transportation or receipt of property stolen or taken by fraud; wire fraud; felony violations of the FCPA; or to a conspiracy to commit one of the foregoing offenses.

42

175.     As further set forth above, the transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity by, among other things, funneling the funds through multiple bank accounts held in the names of disparate entities and, subsequently, titling the assets in the name of shell companies.

176.     Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that it was involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) or is traceable to such property.

## **FOURTH CLAIM FOR FORFEITURE**

177.     The United States incorporates by reference ¶¶ 1 through 176 above as if fully set forth herein.

178.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property" is subject to forfeiture to the United States.

179.     Section 1956(a)(2) imposes criminal penalties on any person who:

Transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States --

. . .

(B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part --

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

180.     For purposes of § 1956, "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv), and 1956(c)(7)(D) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); (v) wire fraud (18 U.S.C. § 1343); and any felony violation of the FCPA (15 U.S.C. § 78dd-1 *et seq.*).

181.     As set forth above, the Defendant In Rem was involved in, or is traceable to, the transportation, transmission, or transfer of funds to a place in the United States from or through a place outside the United States or to a place outside the United States from or through a place in the United States, in which such funds were derived from specified unlawful activity, including bribery of a public official or the misappropriation, theft, or embezzlement of public funds for the benefit of a public official, in violation of the laws of Nigeria; the interstate transportation or receipt of property stolen or taken by fraud; wire fraud; felony violations of the FCPA; or to a conspiracy to commit one of the foregoing offenses.

182.     As further set forth above, such transportation, transmissions, or transfers were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity by, among other things, funneling the funds through multiple bank accounts held in the names of disparate entities and, subsequently, titling the assets in the name of shell companies.

183.     Therefore, the Defendant In Rem is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) on the grounds that they were involved in violations of 18 U.S.C. § 1956(a)(2)(B)(i) or are traceable to such property.

## FIFTH CLAIM FOR FORFEITURE

184. The United States incorporates by reference ¶¶ 1 through 183 above as if fully set forth herein.

185. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 or 1957], or any property traceable to such property" is subject to forfeiture to the United States.

186. Section 1956(h) imposes criminal penalties on any person who "conspires to commit any offense defined in [18 U.S.C. § 1956 or 1957]."

187. As set forth above, the Defendant In Rem was involved in or was the subject of a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and/or 1957, which transactions involved the proceeds of, or property traceable to the proceeds of, specified unlawful activity, including, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) interstate transportation of stolen or fraudulently obtained property (18 U.S.C. § 2314); (iv) interstate receipt of stolen property (18 U.S.C. § 2315); (v) wire fraud (18 U.S.C. § 1343); and any felony violation of the FCPA (15 U.S.C. § 78dd-1 *et seq.*).

188. Accordingly, the Defendant In Rem is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A) on the grounds that it constitutes property involved in a conspiracy or conspiracies to violate 18 U.S.C. §§ 1956 and/or 1957, all in violation of 18 U.S.C. § 1956(h) or are traceable to such property.

## CLAIM FOR RELIEF

**WHEREFORE** Plaintiff, the United States, requests as follows:

(1)     That the Court enter judgment against the Defendant In Rem, and in favor of the

United States, on all claims alleged in the Complaint.

(2)     That the Court issue process to enforce the forfeiture of the Defendant In Rem,

requiring all persons having an interest in the Defendant In Rem be cited to appear

and show cause why the forfeiture should not be decreed, and that this Court decree

forfeiture of the Defendant In Rem to the United States of America for disposition

according to law; and

(3)     That the Court grant the United States such other relief as this Court may deem just

and proper, together with the costs and disbursements of this action.

Dated:  July 16, 2020

Respectfully submitted,

DEBORAH CONNOR, CHIEF
MONEY LAUNDERING AND ASSET
    RECOVERY SECTION (MLARS)


By:     ___/s/ *Joshua L. Sohn*___
        MARY BUTLER
        Chief, MLARS-International Unit
        STEPHEN CAMPBELL
        Deputy Chief, MLARS-IU
        JOSHUA L. SOHN (CA Bar No. 250105)
        MICHAEL W. KHOO (DC Bar No. 997796)
        Trial Attorneys, MLARS-IU
        United States Department of Justice
        1400 New York Avenue, NW
        Bond Building, Suite 10100
        Washington, DC  20005
        Telephone:  (202) 514-1263
        Facsimile:   (202) 616-2547
        Email:       joshua.sohn@usdoj.gov
                     michael.khoo@usdoj.gov

        Attorneys for Plaintiff
        UNITED STATES OF AMERICA

## VERIFICATION

I, ELIZABETH CRISPINO, a Special Agent with the Federal Bureau of Investigation
("FBI"), hereby verify and declare under penalty of perjury that I have read the foregoing
Verified Complaint *In Rem* and know the contents thereof, and that the factual statements
contained in the Verified Complaint are true to my own knowledge, except those factual
statements herein stated to be alleged on information and belief and as to those factual statements
I believe them to be true.

In signing this verification I am not opining on any legal theories or conclusions contained
herein.

The sources of my knowledge and information and the grounds of my belief are the official
files and records of the United States, information supplied to me by law enforcement officers, as
well as my investigation of this case, together with others, as a Special Agent of FBI.  This
Verified Complaint does not set forth each and every fact learned during the course of this
investigation or known to the United States but rather only contains those factual statements
necessary to establish, by a preponderance of the evidence, that the Defendant Property is subject
to forfeiture.  The dates and amounts referred to in this Verified Complaint are approximate.  The
names referenced may have alternate spellings in original and translated documents.

I hereby verify and declare under penalty of perjury under the laws of the United States of
America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.


Executed this 16th day of July, 2020

*Elizabeth Crispino*

ELIZABETH CRISPINO

SPECIAL AGENT

FEDERAL BUREAU OF INVESTIGATIO

# EXHIBIT A

4

## EXHIBIT A

### DESCRIPTION OF PROPERTY

**PARCEL 1:**

LOT 7 OF BLOCK 4 OF TRACT NO. 9745, IN THE CITY OF LOS ANGELES, COUNTY OF
LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141, PAGES
93 TO 96 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID
COUNTY.

**PARCEL 2:**

AN EASEMENT AS GRANTED BY THAT CERTAIN GRANT OF EASEMENT, RECORDED
MAY 23, 2013 AS INSTRUMENT NO. 20130780504, OF OFFICIAL RECORDS, FOR CERTAIN
IMPROVEMENTS AS DEFINED THEREIN AND FOR INGRESS AND EGRESS WITHIN A
PORTION OF LOT 8 IN BLOCK 4 OF SAID TRACT NO. 9745 AS DESCRIBED THEREIN.

APN: 4370-003-011

Exhibit A

**CTC 002615**

CTC 002657

# EXHIBIT B

## Selected Nigerian Law

## SELECTED PROVISIONS OF NIGERIAN LAW

### Corrupt Practices and other Related Offenses Act (2000) Cap. (5) (Nigeria)

. . .

8.    (1)  Any person who corruptly—

   (a) ask, receives or obtains any property or benefit of any kind for himself or for any other person; or

   (b) agree or attempts to receive or obtain any property or

   (c) benefit of any kind for himself or for any other person, on account of—

      (i)  anything already done or omitted to be done, or for any favour or disfavour already shown to any person by himself in the discharge of his official duties or in relation to any matter connected with the functions, affairs or business of a Government department, or corporate body or other organisation or institution in which he is serving as an official; or

      (ii) anything to be afterwards done or omitted to be done or favour or disfavour to be afterwards shown to any person, by himself in the discharge of his official duties or in relation to any such matter as aforesaid, is guilty of an offence of Official corruption and is liable to imprisonment for seven (7) years.

. . .

9.    (1)  Any person who corruptly—

   (a) gives, confers or procures any property or benefit of any kind to, on or for a public officer or to, on or for any other person; or

   (b) promises or offers to give, confers, procure or attempt to procure any property or benefit of any kind to, on or for a public officer or any other person, on account of any such act, omission, favour or disfavour to be done or shown by the public officer is guilty of an offence of official corruption and shall on conviction be liable to imprisonment for seven (7) years.

. . .

22.   (1)  Any person who, without lawful authority or reasonable excuse, offers an advantage to a public servant as an inducement to or reward for or otherwise on account of such public servant's giving assistance or using influence in, or having given assistance or used influence in—

(a) the promotion, execution, or procuring of—

    (i) any contract with a public body for the performance of any work, the providing of any service, the doing of anything or the supplying of any article, material or substance; or

    (ii) any sub-contract to perform any work, provide any article, materials or substance required to be performed, provided, done or supplied under any contract with a public body; or

(b) the payment of the price, consideration or other moneys stipulated or otherwise provided for in any such contract of sub-contract as aforesaid, shall be guilty of an offence.

(2)  Any public servant who, without lawful authority or reasonable excuse, solicits or accepts any advantage as an inducement to or reward for or otherwise on account of his giving assistance or using influence in, or having given assistance or used influence in—

    (a) the promotion, execution or procuring, or

    (b) the payment of the price, consideration, or

    (c) other moneys stipulated or otherwise provided for in,

any contract, or sub-contract as is referred to in sub-section (1) shall be guilty of an offense.

(3)  Any public officer who in the course of his official duties, inflates the price of any goods or service above the prevailing market price or professional standards shall be guilty of an offence under this Act and liable on conviction to imprisonment for a term of seven (7) years and a fine of one million naira.

(4)  Any public officer who, in the discharge of his duties awards or signs any contract without budget provision, approval and cash backing, shall be guilty of an offence under this Act and on conviction be liable to three (3) years imprisonment and a fine of one million naira.

(5)  Any public officer who transfers or spends any sum allocated for a particular project, or service, or another project or service, shall be guilty of an offence under this Act and on conviction be liable to one (1) year imprisonment or a fine of fifty thousand naira.

(6)  Any person or public officer who commits an offence under section 22 (1) and (2) shall be liable on conviction to a term of imprisonment for seven (7) years or a one million naira fine.

**Advance Fee Fraud and other Fraud Related Offences Act (2006) Cap. (A6) (Nigeria)**

**Part I**
*Offenses*

1.    (1)  Notwithstanding anything contained in any other enactment or law, any person who by any false pretence, and with intent to defraud

      (a) obtains, from any other person, in Nigeria or in any other country for himself or any other person;

      (b) induces any other person, in Nigeria or any other country, to deliver to any person; or

      (c) obtains any property, whether or not the property is obtained or its delivery is induced through the medium of a contract induced by the false pretense,

commits an offense under this Act.

(2)  A person who by false pretence, and with the intent to defraud, induces any other person, in Nigeria or in any other country, to confer a benefit on him or on any other person by doing or permitting thing to be done on the understanding that the benefit has been or will be paid for commits an offence under this Act.

(3)  A person who commits an offence under subsection (1) or (2) of this section is liable on conviction to imprisonment for a term of not more than 20 years and not less than seven years without the option of a fine.

. . .

8.    A person who—

      (a) conspires with, aids, abets, or counsels any other person to commit an offence; or

      (b) attempts to commit or is an accessory to an act or offence; or

      (c) incites, procures or induces any other person by any means whatsoever to commit an offence

under this Act, commits the offence and is liable on conviction to the same punishment as is prescribed for that offence under this Act.

JS 44  (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| **I. (a)  PLAINTIFFS**<br>United States of America | **DEFENDANTS**<br>Real Property Located in Los Angeles, Calif. Commonly Known as 755 Sarbonne Rd. |
|---|---|
| **(b)**  County of Residence of First Listed Plaintiff _____<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant ___Los Angeles___<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
| **(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*<br>Joshua L. Sohn<br>U.S. Department of Justice, 1400 New York Ave. NW, Suite 10100, Washington, D.C. 20530 (202) 353-2223 | Attorneys *(If Known)* |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
     Plaintiff

☐ 2  U.S. Government
     Defendant

☐ 3  Federal Question
     *(U.S. Government Not a Party)*

☐ 4  Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>   & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>   Student Loans<br>   (Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br>   of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>   Liability<br>☐ 320 Assault, Libel &<br>   Slander<br>☐ 330 Federal Employers'<br>   Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>   Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>   Product Liability<br>☐ 360 Other Personal<br>   Injury<br>☐ 362 Personal Injury -<br>   Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury -<br>   Product Liability<br>☐ 367 Health Care/<br>   Pharmaceutical<br>   Personal Injury<br>   Product Liability<br>☐ 368 Asbestos Personal<br>   Injury Product<br>   Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>   Property Damage<br>☐ 385 Property Damage<br>   Product Liability | ☐ 625 Drug Related Seizure<br>   of Property 21 USC 881<br>☒ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>   28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated<br>   New Drug Application<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC<br>   3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>   Corrupt Organizations<br>☐ 480 Consumer Credit<br>   (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer<br>   Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br>   Exchange<br>☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>   Accommodations<br>☐ 445 Amer. w/Disabilities -<br>   Employment<br>☐ 446 Amer. w/Disabilities -<br>   Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br>   Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br>   Conditions of<br>   Confinement | ☐ 710 Fair Labor Standards<br>   Act<br>☐ 720 Labor/Management<br>   Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br>   Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br>   Income Security Act | ☐ 870 Taxes (U.S. Plaintiff<br>   or Defendant)<br>☐ 871 IRS—Third Party<br>   26 USC 7609<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br>   Actions | ☐ 893 Environmental Matters<br>☐ 895 Freedom of Information<br>   Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure<br>   Act/Review or Appeal of<br>   Agency Decision<br>☐ 950 Constitutionality of<br>   State Statutes |

## V.  ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
     Proceeding

☐ 2  Removed from
     State Court

☐ 3  Remanded from
     Appellate Court

☐ 4  Reinstated or
     Reopened

☐ 5  Transferred from
     Another District
     *(specify)*

☐ 6  Multidistrict
     Litigation -
     Transfer

☐ 8  Multidistrict
     Litigation -
     Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. sec. 981 and 983
Brief description of cause:
Civil forfeiture of real property

## VII.  REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS **A CLASS ACTION**
   UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   Hon. Keith P. Ellison

DOCKET NUMBER   4:17-cv-02166 (S.D. Tex.)

DATE
07/16/2020

SIGNATURE OF ATTORNEY OF RECORD
/s/ Joshua L. Sohn

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____